UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

PODHURST ORSECK, P.A.

    Plaintiff,

vs.

JEFFREY EPSTEIN,

    Defendant.
_____/

## COMPLAINT

Plaintiff, Podhurst Orseck, P.A., sues Defendant, Jeffrey Epstein, for attorney's fees and costs incurred in the representation of over a dozen minor women sexually abused and exploited by Defendant, and for which Defendant expressly agreed to pay pursuant to a Non-Prosecution Agreement that he entered into with the United States Attorney's Office for the Southern District of Florida. Plaintiff further alleges:

## ALLEGATIONS PERTAINING TO ALL COUNTS

### Jurisdiction

1. Plaintiff, Podhurst Orseck, P.A. ("Podhurst firm" or "Plaintiff") is a law firm organized and operating as a professional association under the laws of the State of Florida with offices in Miami-Dade County, Florida. For over four decades, the Podhurst firm has concentrated its practice exclusively in trial and appellate litigation in both federal and state court.

2. Defendant, Jeffrey Epstein ("Epstein" or "Defendant"), is fifty-seven years old and is a convicted sexual offender who is a citizen of the Territory of the United States Virgin Islands, where he owns a residence on his own private 70-acre island called "Little St. James."

3. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because the parties are from different states, and federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the claims brought are founded on federal common law and implicate a unique federal interest, for they relate to a Non-Prosecution Agreement entered into by the United States of America, through the United States Attorney's Office for the Southern District of Florida ("USAO").

**Venue**

4. Defendant currently can be found in Palm Beach, Palm Beach County, Florida, at his mansion located at 358 El Brillo Way, valued at $6.8 million. Until June 2008, he maintained his principal place of residence in the largest dwelling in Manhattan, a 51,000-square-foot eight-story mansion on the Upper East Side. Defendant also owns a $30 million, 7,500 –acre ranch in New Mexico. In addition to these properties and the Island of Little St. James, and upon information and belief, Defendant is believed to own, or has owned, either directly or indirectly, various residences, including an apartment on the prestigious Avenue Foch in Paris, France; a Boeing 727, a Gulfstream jet, and a helicopter; and a fleet of luxury automobiles, including a Ferrari 575 M.

5. Defendant currently remains in Florida subject to community control while completing a sentence pursuant to a plea of guilty to two felony counts - - Solicitation of Prostitution and Procuring Person Under 18 for Prostitution - - entered in state court in Palm Beach County on June 30, 2008. As one of several conditions of his sentence, Defendant was designated as a Sexual Offender pursuant to Florida law.

6. Plaintiff's third-party claims are derived from a Non-Prosecution Agreement between the United States of America, through the USAO and Defendant, which was executed on or about October 30, 2007 and consists of an initial agreement ("Agreement") and an Addendum ("Addendum"), which, collectively, are referred to as the Non-Prosecution Agreement ("NPA"), *attached hereto as Composite Exhibit A.*

7. Defendant and one of his several attorneys signed the Agreement in New York on September 24, 2007 and the Addendum on September 29, 2007. Upon information and belief, another counsel for Epstein executed the Agreement on September 24, 2007 and the Addendum on October 29, 2007 while in California or Miami. The Assistant United States Attorney who investigated Defendant signed the NPA on September 27, 2007 in West Palm Beach, Florida on behalf of the USAO, whose main office was in Miami, Dade-County, Florida. The last person to sign the agreement was the Chief Assistant United States Attorney, who signed the Addendum for the USAO in Miami on October 30, 2007.[1]

### The Non-Prosecution Agreement

8. The NPA provided that the USAO and the Federal Bureau of Investigation ("FBI") had investigated Defendant for sexually related federal crimes involving minor females, including, but not limited to, the following:

> (1) knowingly and willfully conspiring with others known and unknown to commit an offense against the United States, that is, to use a facility or means of interstate or foreign commerce to knowingly persuade, induce, or entice minor females to engage in prostitution, in violation of Title 18, United States Code, Section 2422(b); all in violation of Title 18, United States Code, Section 371;

---

[1] On December 7, 2007, Epstein signed a one-sentence Affirmation of the NPA and Addendum, which he acknowledged were dated October 30, 2007.

 (2) knowingly and willfully conspiring with others known and unknown to travel in interstate commerce for the purpose of engaging in illicit sexual conduct, as defined in 18 U.S.C. § 2423(f), with minor females in violation of Title 18, United States Code, Section 2423(b); all in violation of Title 18, United States Code Section 2423(e);

 (3) using a facility or means of interstate or foreign commerce to knowingly persuade, induce, or entice minor females to engage in prostitution; in violation of Title 18, United States Code, Sections 2422(b) and 2;

 (4) traveling in interstate commerce for the purpose of engaging in illicit sexual conduct, as defined in 18 U.S.C. § 2423(f), with minor females; in violation of Title 18, United States Code, Section 2423(b); and

 (5) knowingly, in and affecting interstate and foreign commerce, recruiting, enticing, and obtaining by any means a person, knowing that the person had not attained the age of 18 years and would be caused to engage in a commercial sex act as defined in 18 U.S.C. § 1591(c)(1); in violation of Title 18, United States Code, Sections 1591(a)(1) and 2.

9. The NPA further provided that federal prosecution for these crimes would be deferred in favor of prosecution by state authorities, provided that Defendant abided by all of the terms and conditions set forth in the NPA.

10. Among the terms to which Epstein expressly agreed was the appointment of an attorney representative to represent the young women he victimized as minors by his illicit, sexual conduct.

11. Epstein not only agreed to the appointment of the attorney representative, but agreed to pay for any fees and costs that the attorney representative incurred before, during, and through settlement of the various cases. More specifically, Epstein agreed to the following:

 7. The United States shall provide Epstein's attorneys with a list of individuals whom it has identified as victims, as defined in 18 U.S.C. § 2255, after Epstein has signed this agreement and been sentenced. *Upon the execution of this agreement, the United States, in consultation with and subject to the good faith approval of Epstein's counsel, shall select an attorney representative for these persons, who shall be paid for by Epstein.* Epstein's counsel may

4

        contact the identified individuals through that representative.

7A.    The United States has the right to assign to an independent third-party the responsibility for consulting with and, subject to the good faith approval of Epstein's counsel, selecting the attorney representative for the individuals identified under the Agreement. *If the United States elects to assign this responsibility to an independent third-party, both the United States and Epstein retain the right to make good faith objections to the attorney representative suggested by the independent third-party prior to the final designation of the attorney representative.*

7C.    *Pursuant to additional paragraph 7A, Epstein has agreed to pay the fees of the attorney representative selected by the independent third party. This provision, however, shall not obligate Epstein to pay the fees and costs of contested litigation filed against him.* Thus, if after consideration of potential settlements, an attorney representative elects to file a contested lawsuit pursuant to 18 U.S.C. § 2255 or elects to pursue any other contested remedy, the paragraph 7 obligation of the Agreement to pay the costs of the attorney representative, as opposed to any statutory or other obligations to pay reasonable attorneys fees and costs such as those contained in § 2255 to bear the costs of the attorney representative, shall cease.

8.    If any of the individuals referred to in paragraph (7), *supra*, elects to file suit pursuant to 18 U.S.C. § 2255, Epstein will not contest the jurisdiction of the United States District Court for the Southern District of Florida over his person and/or the subject matter, and Epstein waives his right to contest liability and also waives his right to contest damages up to and an amount as agreed to between the identified individuals and Epstein, so long as the identified individuals elect to proceed exclusively under 18 U.S.C. § 2255, and agrees to waive any other claim for damages, whether pursuant to state, federal, or common law. Notwithstanding this waiver, as to those individuals whose names appear on the list provided by the United States, Epstein's signature on this agreement, his waivers and failures to contest liability and such damages in any suit are not to be construed as an admission of any criminal or civil liability.

5

12. According to the NPA, Epstein's failure to pay the fees and costs of the attorney representative would constitute a material breach of the NPA because, by "signing this agreement, Epstein assert[ed] and certifie[d] that each of [the NPA's] terms is material to this agreement and is supported by independent consideration and that a breach of any one of these conditions allows the United States to elect to terminate the [NPA] and to investigate and prosecute Epstein and any other individual or entity for any and all federal offenses."

13. The attorney representative who was to counsel, advise, and represent the young women who, as minors, were victimized by Defendant's illicit, sexual conduct was to be chosen by a Special Master, The Honorable Edward B. Davis, former Chief Judge of the United States District Court for the Southern District of Florida, whose office was in Miami, Florida. The Special Master was instructed by the USAO to identify a lawyer with extraordinary experience and abilities. Specifically, in selecting the attorney representative, the USAO instructed the Special Master that, "[d]ue to the circumstances of the case and the number and caliber of the attorneys who represent Mr. Epstein, in selecting the victims' attorney representative, the United States suggests that you consider the following criteria:"

1. Experience doing both plaintiffs' and defense litigation.

2. Experience with state and federal statutory and common law tort claims.

3. The ability to communicate effectively with young women.

4. Experience litigating against large law firms and high profile attorneys who may test the veracity of the victims' claims.

5. Sensitivity to the nature of the suit and the victims' interest in maintaining their privacy.

6. Experience litigating in federal court in the Southern District of Florida.

    7.    The resources to hire experts and others, while working on a contingency fee basis, in order to prepare for trial, if a settlement cannot be reached (defense counsel has reserved the right to challenge such litigation).

    8.    The ability to negotiate effectively.

*Letter dated October 25, 2007, from First Assistant United States Attorney to the Honorable Edward B. Davis (Ret.), attached hereto as Exhibit B.*

    14.    The attorney representative recommended by the Special Master and agreed to by the USAO and Epstein was Robert C. Josefsberg, Esq., a partner in the Podhurst firm. A graduate of Darmouth College and Yale Law School, Mr. Josefsberg is one of Florida's premier trial lawyers. For years he has been listed in the *Best Lawyers in America* as both a business litigator and a criminal defense lawyer, and, since 2003, has been listed in *Chambers & Partners* as one of the top four commercial litigators in Florida. Mr. Josefsberg is a past President and Dean of the International Academy of Trial lawyers, a fellow of the American College of Trial Lawyers, and a Member of the American Board of Trial Advocates. Throughout his career, Mr. Josefsberg has received numerous awards, including the David Dyer Professionalism Award and the Tobias Simon Pro Bono Award, which is "presented annually by the Chief Justice [of the Florida Supreme Court] to the attorney who best exemplifies the highest ideals of the profession in assuring the availability of legal services to the poor."

    15.    Mr. Josefsberg devoted his time and effort as the attorney representative for those victims of Defendant who chose to avail themselves of his services according to the terms provided in the NPA. The attorney representative began his work relying upon the obligation of Defendant to pay his fees and costs, as well as the representation of Defendant's counsel that the attorney representative would be paid his "usual and customary hourly rates" for his work.

*Letter dated September 2, 2008 from Epstein's counsel to Assistant United States Attorney, attached hereto as Exhibit C.*

16. Throughout the defense of the claims that were made by the young women being represented by the attorney representative, as well as the settlement of those claims, Epstein was represented by a large number of nationally and locally recognized lawyers, including, but not limited to, Kenneth Starr, Esq. and Jay Lefkowitz, Esq. of Kirkland & Ellis LLP, a global law firm with approximately 1,500 lawyers; Alan Dershowitz, the renowned Harvard Law Professor who has been called the "top lawyer of last resort in the country;" Roy Black, Esq., recognized as one of the country's premier trial lawyers; Martin G. Weinberg, Esq., one of the country's most prominent criminal defense lawyers; Jack A. Goldberger, Esq., a prominent Palm Beach lawyer; and Robert D. Critton, Jr., Esq. and Michael Burman, Esq. of the firm Burman, Critton Luttier & Coleman, LLP, a prominent Palm Beach law firm.

17. Because of the number and caliber of lawyers representing Epstein, as well as the number of women being represented and the severe psychological injuries that these young women had sustained as victims of Epstein, the attorney representative recognized early on that he would need additional support from both inside and outside the Podhurst firm. This additional support was critical to ensure that these women were thoroughly and adequately represented. Accordingly, the attorney representative, Mr. Josefsberg, sought and obtained the assistance of his partner, Katherine W. Ezell, other employees of the firm, and two independent contractors, Amy Josefsberg Ederi, Esq. and Susan E. Bennett, Esq., who were chosen for their respective skills and experience (collectively, the "team"). Epstein, either directly or through one of his many lawyers, was aware of the specific lawyers assisting the attorney representative.

18. As a result of, and in reliance upon, the representations of Defendant and his attorneys, and pursuant to Defendant's obligations in the NPA, Mr. Josefsberg and his team undertook the legal representation of over a dozen of Defendant's victims, all of whom were among the thirty-three (33) females identified by the USAO as those upon whose testimony the USAO was prepared to move forward in federally prosecuting Defendant.

19. The representation of these young women who had been sexually abused and exploited as minors by Epstein was arduous and difficult.

20. The representation was arduous and difficult in large part because of the psychological and physical damages these females had suffered, and continue to suffer, as a result of Defendant's sexual conduct. By way of example only, Defendant began sexually abusing and exploiting one of his female victims when she was only fifteen (15) years old. After luring this fifteen-year-old to his mansion and assaulting her with the assistance of one of the several women who would procure minor females for Defendant's pleasure, Defendant lured her to his Palm Beach mansion every day for the next two weeks in order to engage in a similar pattern of sexual abuse and exploitation.

21. Defendant eventually "groomed" this adolescent minor and immersed her into his lewd and sexually exploitive lifestyle. Specifically, Defendant's daily routine required this minor female to perform sexually on Defendant multiple times per day. This minor victim had absolutely no say as to when, how many times, or what was done during each sexual encounter.

22. In addition to being continually exploited to satisfy Defendant's every sexual whim, this adolescent was required to be sexually exploited by Defendant's adult male peers, including royalty, politicians, academicians, businessmen, and other professional and personal acquaintances.

23. The other women whom Mr. Josefsberg and his team represented also suffered sexual abuse and exploitation as minor victims of Defendant.

24. Throughout the representation, Mr. Josefsberg and his team met with, advised, and counseled these sexually abused and exploited young women on their potential claims against Defendant, as well as the prospects of settlement.

25. The representation of these young women by Mr. Josefsberg and his team included, but was not limited to:

    a. meeting with and receiving training and information from experts in child sex abuse in order to be able to recognize perpetrators' patterns and effects on the lives of young female victims;

- conducting a nation-wide search for the most qualified, appropriate, and effective experts to evaluate clients with injuries of this type, including research and initial requests for proposals from numerous psychologists as candidates;

- reviewing qualifications, consulting with peers, and talking to and corresponding with candidates;

- conducting interviews in person with the final candidates;

- working with selected psychological experts to understand and assess the damages suffered by the young women;

- negotiating and formulating the evaluation procedure; and

- coordinating the arrangements to enable the chosen experts to conduct testing, interviews, and evaluations of each client;

    b. interviewing the young women at length to assess their background, the conduct to which they had been subjected, and the physical and psychological damage they had suffered as a result of Defendant's conduct;

    c. interviewing collateral witnesses, including parents, siblings, husbands, and others relating to each of the young women as a means of assessing the injuries they had sustained;

    d.    researching the damages and other remedies available under 18 U.S.C. § 2255, a seldom used federal statute under which the young women were proceeding pursuant to the NPA;

    e.    researching 18 U.S.C. § 2255, which was amended in 2006, in order to assess the applicable version of the statute;

    f.    researching the predicate offenses upon which claims under § 2255 could be established;

    g.    determining the implication of the statutes of limitations on each young woman's case;

    h.    investigating and assessing the background, history, and ongoing status of Defendant;

    i.    reviewing and examining the records of the young women, including, but not limited to, medical, educational, and mental health;

    j.    in some instances where the clients had journals, photographs, and/or scrap books, reviewing those materials;

    k.    researching and briefing certain critical issues and negotiating agreements pertaining thereto, only to have to resort to court intervention, including, but not limited to, location and preservation of evidence and the need and practical application of a No-Contact Order to protect clients from harassment and intimidation;

    l.    engaging in extensive and protracted settlement negotiations with Defendant and his multitude of lawyers;

    m.    often drafting from Defendant's specifications, the results of which when presented, were rejected in favor of substantive changes never before discussed.

26. In spite of Defendant's non-compliance throughout this process, after extensive, lengthy, and protracted negotiations with Defendant and several of his attorneys, settlements have been finalized and executed in many of the cases handled by the attorney representative.

11

27. During those extensive, lengthy, and protracted settlement negotiations, Defendant took positions that, at best, were unreasonable, and, at worst, exemplified his continuing bad faith.

28. Extensive and lengthy discussions similarly ensued when it became clear that Defendant did not intend to abide by the NPA by promptly paying the fees and costs of the Podhurst firm, Mr. Josefsberg, and his team for their representation of the young women who, as minors, were sexually abused and exploited by Defendant. Intense and frustrating negotiations regarding Defendant's obligation to pay were conducted between the Podhurst firm and Defendant's multitude of lawyers over the course of more than twenty (20) months of representation.

29. The representation and legal work done by Mr. Josefsberg, the attorney representative, and his team on behalf of the young women who, as minors, were sexually abused and exploited by Defendant has generated, and continues to generate, significant attorney's fees and costs that Defendant expressly agreed to pay pursuant to the NPA.

30. For the extensive legal work done on behalf of these young women through settlement by Mr. Josefsberg and his team, the Podhurst firm is currently owed a total of more than Two Million Dollars ($2,000,000) in fees and costs, with additional fees and costs being incurred and billed to Defendant in the future.

31. Defendant's failure to pay the fees and costs of the attorney representative and the Podhurst firm is a material breach of his obligations under the NPA and has totally thwarted and frustrated the intent and purpose of having the attorney representative and his team represent the many young women who, as minors, were sexually abused and exploited by Defendant.

32. Epstein's failure to pay the attorney's fees and costs he expressly agreed to pay the attorney representative is not his only material breach of the NPA. Despite his agreement and promise in the NPA to waive his right to contest liability in any suit brought pursuant to 18 U.S.C. § 2255, Epstein has breached this obligation by contesting liability in the cases against him by the young women who, as minors, he sexually abused and exploited. On at least one occasion, the USAO placed Defendant on notice that he was in breach of the NPA.

33. It has become abundantly clear that Epstein, having obtained the benefits of the NPA and having escaped federal criminal prosecution, now believes that he can simply ignore—without consequence—the obligations imposed under the NPA. Put simply, Epstein believes he is above the law.

## COUNT I
## BREACH OF THIRD PARTY AGREEMENT

34. Plaintiff realleges paragraphs 1 through 33 as though they were fully set forth herein.

35. The NPA is an enforceable agreement between the Defendant and the United States, both of whom entered into the NPA with the intent of benefiting certain third parties.

36. The NPA specifically and clearly intended to benefit the Podhurst firm, in that the attorney representative, a Podhurst partner who is compensated by the firm, was to be paid for his services at his regular customary hourly rate by Epstein.

37. The attorney representative, certain other members and employees of the Podhurst firm, and the independent lawyers and experts they hired to assist them in the representation of the young women who, as minors, were abused and exploited by Defendant, generated fees at their usual hourly rates, as well as expenses and costs.

38. Despite Defendant's express agreement and obligation under the NPA to pay for the fees and costs incurred by the attorney representative in connection with the representation of the many minor females who Defendant sexually abused and exploited, Defendant has paid only a small portion of the fees and costs incurred, and has failed–despite numerous meetings and repeated requests–to pay the remainder of the outstanding fees and costs due the attorney representative and the Podhurst firm.

39. Defendant's failure to pay the attorney representative and his team the attorney's fees and costs incurred is a clear and material breach of Defendant's obligation under the NPA.

40. Such material breach of the NPA has caused substantial damages to the Podhurst firm, the attorney representative, and the independent lawyers who were intended beneficiaries under the NPA.

WHEREFORE, as a result of Defendant's breach of the NPA and the resulting damages to its intended third party beneficiary, Plaintiff seeks damages in excess of Two Million Dollars ($2,000,000), representing the attorney's fees and costs incurred by the Podhurst firm and the attorney representative on behalf of Defendant's victims, along with the reasonable fees and costs associated with their efforts herein to make themselves whole, including, but not limited to, attorney's fees and costs pursuant to Florida Statutes, pre-judgment and post-judgment interest, and any other relief this Court deems just and proper.

## COUNT II
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

41. Plaintiff realleges paragraphs 1 through 33 as though fully set forth herein.

42. The NPA is an enforceable agreement between Defendant and the United States. Defendant and the United States entered into the NPA with the clear and expressed intent to

benefit certain third parties, including the attorney representative, Mr. Josefsberg, and the Podhurst firm.

43. The NPA contains an implied covenant of good faith and fair dealing.

44. Under the NPA, Defendant expressly agreed and was obligated to pay the fees and costs of the attorney representative, a partner at the Podhurst firm, before, during, and through any settlement of each case that he and the Podhurst firm were handling on behalf of the victims whom Defendant sexually abused and exploited.

45. Specifically, the NPA expressly provides that, "[u]pon the execution of this agreement, the United States, in consultation with and subject to the good faith approval of Epstein's counsel, shall select an attorney representative for these persons, who shall be paid for by Epstein."

46. The NPA further provides that "Epstein has agreed to pay the fees of the attorney representative."

47. Defendant breached the implied covenant of good faith and fair dealing contained in the NPA, as well as in those provisions in which Defendant agreed to pay the fees and costs of the attorney representative, by, among other things,

(a) repeatedly delaying the payment of the fees and costs incurred through settlement by the attorney representative and his team;

(b) despite suggesting that a Special Master be selected to settle the issue of fees and costs incurred by the attorney representative, initially denying the existence of the parties' agreement to do so, and delaying the selection of such Special Master by making numerous, unreasonable, and often surreptitious changes to the proposed Special Master agreement; and

(c) causing the attorney representative and the Podhurst firm to incur additional fees and costs by not responding to requests in a timely fashion, or at all; by taking unreasonable positions, including contesting liability of a § 2255 claim; and by reaching agreement on various issues and then reneging on the agreements reached, all the while contending that the fees and costs incurred by the attorney representative and his team were excessive and unreasonable.

48. By his actions, Defendant has acted in bad faith, unfairly, unconscionably, and maliciously toward the attorney representative and his team, who were clearly intended beneficiaries under the NPA, and has caused the Plaintiff damages.

WHEREFORE, as a result of Defendant's unreasonable and unconscionable actions, which constitute a breach of the implied covenant of good faith and fair dealing in the NPA, Plaintiff seeks damages in excess of Two Million Dollars ($2,000,000), representing the attorney's fees and costs incurred by the Podhurst firm on behalf of Defendant's victims through

settlement and pursuant to the NPA, along with the reasonable fees and costs associated with its efforts herein to make itself whole, attorneys fees and costs pursuant to Florida Statutes, pre-judgment and post-judgment interest, and any other relief this Court deems just and proper.

DATED this 17th day of May, 2010.

                              Respectfully submitted,

                              PODHURST ORSECK, P.A.
*Attorneys for Plaintiff*
City National Bank Building
25 W. Flagler Street, Suite 800
Miami, FL 33130
Telephone: (305) 358-2800
Facsimile: (305) 358-2382

By: /s/ Peter Prieto
     Steven C. Marks (FBN 516414)
     smarks@podhurst.com
     Peter Prieto (FBN 501492)
     pprieto@podhurst.com
     John Gravante, III (FBN 617113)
     jgravante@podhurst.com